

Ernest E. Pinkerton, Cavalletto, Webster, Mullen & McCaughey, Santa Barbara, Cal., for plaintiffs.

Jerry R. Stern, Asst. U. S. Atty., Tax Division, Wm. Matthew Byrne, Jr., U. S. Atty., Los Angeles, Cal., for defendant.

HILL, District Judge.

### FINDINGS OF FACT

1. By written contract of sale (Exhibit 1) dated May 9, 1961, Plaintiffs purchased a fire and casualty insurance agency in Santa Barbara, California, for $60,800 from St. Clair Morton (hereinafter referred to as "Morton").

2. The contract of sale allocated $60,000 of the purchase price to "expirations" and $800 to office furniture. Of the total consideration, $10,000 was paid upon execution of the contract and the balance was payable in minimum monthly installments. The buyer had the privilege of prepaying any portion of the balance. The total purchase price had been paid in full some time in 1964.

3. Morton founded the agency in 1933 and conducted business under the name "St. Clair Morton Agency" until approximately 1958.

4. Prior to 1948, Squires had not been engaged in the insurance business. On July 9, 1948, Squires and Morton entered an employment contract (Exhibit A), which remained effective (with an amendment executed in 1951) until May 9, 1961, the date of the aforesaid purchase. The employment agreement provided that in the event Morton retired from the insurance agency business Squires would have an option to purchase the agency at the price set forth therein. It further provided that if ter-

**George H. SQUIRES and Phyllis G. Squires, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 67–1500–IH.**

United States District Court
C. D. California.

July 30, 1968.

minated Squires would not engage in a competitive agency business within a specified geographic area for a period of five years. By mutual agreement of the parties, the purchase price provided in Exhibit A for purchase of the agency, was not used because of complexities in computing the price under the formula contained in Exhibit A.

5. Squires remained employed by Morton in accordance with said employment agreement until May 9, 1961, the date of the aforesaid purchase.

6. During the years of his employment, Squires came to know and to service an increasing number of Morton's clients. As of the date of purchase Squires was acquainted with almost all of Morton's insurance clients.

7. During 1958 Morton suffered a serious illness and thereafter devoted substantially less than full time to the insurance business.

8. As of the date of the purchase, Morton and Squires each had a good reputation in the community and the agency under the name of "Morton and Squires" had a similar reputation in the community and had goodwill associated with it. As of the said date the agency was a going concern and it remained a going concern after the purchase by Squires. The "expirations" purchased by Squires constituted an integral part of, and by far the most important ingredient of, the goodwill of the agency.

9. The business of the agency was almost exclusively the sale of policies of fire and casualty insurance, predominantly to individuals, as opposed to commercial and industrial enterprises. As of the date of the said purchase, the agency had approximately 1300 clients who had approximately 2670 policies then in force. The longest of said policies was written for a term of five years. During the five-year period following the purchase of the agency by Squires only about 100 of said approximately 1300 clients failed to renew their policies with the agency.

10. The approximate percentages of gross premiums paid by the top twenty clients of the agency during the years 1962 through 1964 are as follows:

| 1962 | 1963 | 1964 |
|------|------|------|
| 12% | 18% | 18% |

11. The agency was listed in telephone directories in the Santa Barbara area as "St. Clair Morton Agency" until approximately 1958, when Morton changed the listing to "Morton and Squires". This listing remained unchanged through 1967.

12. The agency operated at the same location and address from 1933 to the present. Its location is on the second floor of an office building. The window overlooking the street showed the agency's name as "St. Clair Morton Agency" on the date of said purchase. This window sign was not changed by Squires until approximately 1965.

13. After purchasing the agency Squires did not send out formal announcements concerning the change in ownership, nor was any publicity given to the sale. Furthermore, Morton continued thereafter to spend some time on the agency's premises.

14. After purchasing the agency from Morton, Squires continued billing the clients in the same manner employed prior to the sale.

15. After purchasing the agency, Squires employed the same individuals formerly employed by Morton.

16. As used in the fire and casualty insurance business and as used in the contract of sale, an "expiration" is a file card containing the following information: The name of the policyholder; the name of the insurance company; the number, the date and the coverage of the insurance policy; and the date on which the policy expires.

17. Knowledge of the information contained in an "expiration", particularly the expiration date of the client's policy, enables the owner of the "expiration" to solicit renewal of the policy at the psychologically best time when its re-

newal can most certainly be obtained and gives to the owner of the "expiration" a great competitive advantage over any other insurance agent desiring to solicit said client's business.

18. The probability that clients of an insurance agency will, after a sale of the agency, renew their policies with the buyer, is higher where the agency has many small clients, such as the agency in question here, as opposed to an agency with a small number of large clients.

19. Upon the purchase of an agency and particularly the purchase of "expirations" from an agency, there is no way of determining exactly the number of clients who will initially renew their insurance with the buyer or how many times such renewals will occur after the first renewal.

20. After purchasing the agency in 1961, Squires continued to use the insurance expirations in his business until the policies related thereto either expired or were renewed.

21. The normal procedure employed by Squires in renewing policies was to take information from the expiration associated with the expiring policy, and use such information in the preparation of a new policy. The information from the new policy was then used in the preparation of a new expiration. Such procedure varied depending upon changes in insurance coverage and premium rates.

22. Normally Squires would destroy an expiration upon the renewal of the policy. However, if the expiration was clean enough it was used again, and necessary changes were made on the face thereof.

23. Plaintiffs assigned a useful life of six years to said expirations for purposes of federal income taxes, and in each of their returns for the years 1962 through 1964 claimed a deduction of $10,000 for the amortization thereof. Such deductions were disallowed by the Commissioner of Internal Revenue upon audit of Plaintiffs' tax returns.

24. The six-year life was not based on industry averages or any meaningful projections, but was arbitrarily assigned merely because such life exceeded the longest duration of any policy then the subject matter of the expirations.

25. Before the said contract of sale was executed, each party was advised by separate counsel as to the tax aspects of the agreement. Morton desired, and insisted upon, a wording of the agreement under which the $60,000 item could be treated by him as capital gain. Squires desired to amortize his payment of the $60,000. However, Squires was advised that payment for goodwill must be capitalized and could not be amortized, whereas payment for "expirations" could possibly be amortized and that either would result in capital gains treatment for Morton. The purpose of designating the $60,000 as the payment for "expirations" was to provide Squires with a method of hopefully writing off this amount against his income and to permit Morton to qualify for capital gains treatment on the same amount.

26. The "expirations" did not have a limited and definitely ascertainable useful life. Each was primarily useful in enabling the purchaser advantageously to solicit renewal of the particular insurance policy near its first expiration date. But collectively, the expirations constituted the customers list of the agency and had great value as a means of permitting the buyer to continue advantageous relationships with the agency's then existing clientele for an indefinite future period. In the few cases where the clients did not renew their business with the agency at the expiration date, the expirations remained of value as a method of permitting effective resolicitation of the lost client on the first expiration date following his transfer to another agency.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties hereto and the subject matter of the action.

2. Plaintiffs have failed to meet their burden of proof and have failed to prove that the $60,000 or any portion thereof

was for property which is subject to an amortization or depreciation deduction within the meaning of § 167(a) of the Internal Revenue Code of 1954.

3. The said payments for "expirations" are held not to be amortizable or depreciable on two alternative grounds: (a) the payments were for the goodwill of the agency; (b) if the payments are deemed as not being made for the goodwill of the agency, the expirations are held to be intangible assets "the useful life of which is not limited" under Internal Revenue Regulations § 1.167(a) (3).

4. The deductions in issue were properly disallowed.

If any of the foregoing Findings of Fact should properly be construed to be a Conclusion of Law, it shall be so deemed. Conversely, if any Conclusion of Law should properly be construed as a Finding of Fact, it shall be so deemed.

Plaintiffs shall take nothing by the action and Defendant is entitled to judgment against Plaintiffs.

### MEMORANDUM OPINION

Detailed findings of fact and conclusions of law are being filed contemporaneously herewith. This memorandum is neither a polished piece of work, nor intended as a full discussion of the law. It is written for the sole purpose of informing counsel of the thinking of the Court underlying the decision of the case.

As will be seen from the findings and conclusions, the Court employs two alternative grounds of decision, i. e. (1) that the payments for these insurance expirations are payments for goodwill; and (2) that even if they are held not to be payments for goodwill, they are payments for assets having no determinable useful life.

The first rationale, i. e. that payments for expirations are payments for goodwill, is supported by a number of opinions. Commissioner of Internal Revenue v. Killian, 314 F.2d 852, 854 (5th Cir. 1963); Rev.Rul. 65–180, Cum.Bul. 1965–

2, p. 279; Salome v. United States, 20 A.F.T.R.2d 5302 (W.D.Tex.1967).[1] Other opinions have referred to expirations as "in the nature of goodwill". (V. L. Phillips & Co. v. Pennsylvania Threshermen, etc., 199 F.2d 244, (4th Cir. 1952)), or "inextricably linked with goodwill" and "an integral part of goodwill". Alfred H. Thoms, 50 T.C. 24, May 7, 1968.

To me it makes no difference in the result, whether expirations are said to be goodwill or a part of goodwill, or on the other hand are said to be like goodwill or linked with goodwill. In essence the courts using such different terminology are all saying that the purchase payments for such expirations may not be depreciated because they constitute the purchase of goodwill which is expressly made non-depreciable under the Regulation. Cf. Geo. J. Aitken, 35 T.C. 227, 230 (1960).

The best discussion of expirations as being goodwill (or so like goodwill that they should be treated the same) is found in *Thoms*, supra. The discussion in the latter part of the opinion (after the discussion of the treatment of the covenant not to compete) is especially helpful. I agree with the *Thoms* court in the following language:

" * * * We have here the transfer of a going insurance agency business and its goodwill. Any definition of goodwill includes the concept of the advantage that the proprietor of an existing business enjoys resulting from the probabilities that old customers will continue their patronage. Surely goodwill in the insurance agency business encompasses the advantage that the agency has, that its policyholders will renew their expiring policies. It is difficult to see how any insurance agency could transfer its goodwill without delivering its insurance expiration list to the transferee. If the list is not given to the transferee of goodwill he receives no benefit in the form of a probability that the policy-

---

1. The opinion uses the term "renewals" but I interpret this to mean expirations of the type involved in the instant case.

holders of the old business will renew with him, which is just another way of saying he did not get the goodwill. If the list is delivered to the transferee of goodwill it merely accomplishes the transfer of the goodwill—defined to be the benefit that he will probably secure the renewals. The transfer of a list of expirations of a going insurance agency business is merely implementing the transfer of goodwill. [Citation] It is furnishing the transferee with records that will give him the opportunity to succeed to the advantageous position of his transferor. In our opinion the list of expirations is an integral part of the goodwill of a going insurance agency business."

The second ground of decision also finds support in various decisions which appear to hold that whether or not the purchase of expirations can be said to be a purchase of goodwill, expirations are assets which have an indefinite useful life. They have been so characterized in Cohan v. Commissioner of Internal Revenue, 39 F.2d 540, 543 (2nd Cir. 1930); John T. Fletcher, P–H T.C. Memo ¶ 65,-273; Wikle v. United States, 15 A.F.T.R. 2d 949 (N.D.Ala.1965); Rev.Rul. 65–175, Cum.Bul. 1965–2, p. 41. Fletcher, supra, is particularly interesting in this regard. There the court had allocated a lump sum consideration to several definite items including a stipulated amount as allocated to goodwill and another amount to the purchase of expirations. Thus that court seems to have held that expirations could not involve goodwill. The court went on to hold that the amount allocated to the purchase of expirations was not depreciable solely because of the nature of the assets purchased, i. e. that they did not have a limited useful life.

I am aware that there are a number of decisions which seem to reach a contrary result to the one I have reached in the instant case. Some can be distinguished on various grounds, i. e. that the agency involved had gone or was going out of this type of business (Weav-er v. United States, 15 A.F.T.R.2d 1073 (W.D.Okl.1965); Stewart v. United States, 16 A.F.T.R.2d 5604 (N.D.Okl. 1965)); that it had a bad reputation (Savings Assurance Agency, Inc., T.C. Memo 1963–52); or that it did not do business with the general public (Vaaler Ins. Inc. v. United States, Civil #4141, D.N.Dak., N.E.Div., decided January 8, 1968, reported 1968 CCH § 9153). Most of the contrary opinions are not well reasoned. Even if they are not truly distinguishable, none of them are binding authority in this Circuit and I chose not to follow them because I am convinced of the greater soundness of those reaching the decision I have reached in the instant case.