**HOUSTON CHRONICLE PUBLISHING COMPANY, Plaintiff-Appellee-Cross Appellant,**

v.

**UNITED STATES of America, Defendant-Appellant-Cross Appellee.**

**No. 72-2881.**

United States Court of Appeals, Fifth Circuit.

July 6, 1973.

Rehearing Denied July 27, 1973.

Howard A. Weinberger, Atty., Tax Div., Dept. of Justice, Dallas, Tex., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Wesley J. Filer, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Fred E. Croshaw, Walter P. Zivley, Houston, Tex., for plaintiff-appellee.

Before BELL, GOLDBERG and SIMPSON, Circuit Judges.

GOLDBERG, Circuit Judge:

This is a tax case raising three complex and unrelated issues, none of which admits of facile solution. Taxpayer, the Houston Chronicle Publishing Company, is a Texas corporation that publishes *The Houston Chronicle,* a major daily newspaper. From 1963 to 1966 taxpayer engaged in the series of actions to expand its facilities and operations that gave rise to the tax questions now before us. Simply stated, those issues are:

(1) Under the Internal Revenue Code of 1954, may a newspaper publisher ever amortize costs incurred in acquiring subscription lists, and if so, has this taxpayer shown itself to be entitled to claim such amortization?

(2) How should a taxpayer who (a) acquires fee title to land and existing buildings, (b) immediately thereafter incurs costs to extinguish existing leases outstanding on those buildings, and then (c) demolishes the structures and erects a new building treat the

lease acquisition costs for income tax purposes?

(3) When may a taxpayer claim a "loss deduction" in connection with the acquisition, abandonment, and eventual demolition of an existing building?

Because each of these issues involves separate transactions and events, we discuss the facts only as they relate to each issue.

## I. AMORTIZATION OF NEWSPAPER SUBSCRIPTION LISTS

The Internal Revenue Code's general section allowing taxpayers to depreciate certain property seems, at least at first blush, to be the essence of simplicity:

"There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income."

26 U.S.C. § 167(a). These deceptively uncomplicated words have, however, led to a floodtide of litigated cases, many of which have involved "intangible property" such as the lists here in dispute. No single rule for the tax treatment of intangible property emerges from those cases and no black-letter statement of the applicable law is available to guide our decision. Instead, each case seems to revolve on the precise nuances of its facts, and we must thus begin our analysis with an in-depth look at the facts before us.

### A. The Operative Facts

Prior to 1964, taxpayer was in competition with a second afternoon newspaper, *The Houston Press,* which was published by the Houston Press Company [hereinafter The Press] [1]. In late 1963 or early 1964, taxpayer resumed previously discontinued negotiations with The Press, aimed at acquiring the assets of *The Houston Press.* The negotiations were successful, and on March 20, 1964, taxpayer entered into a contract with The Press under which taxpayer acquired the land, improvements, fixtures, inventory, equipment, library, and subscription lists owned by The Press. [2] In addition to these assets, taxpayer received a noncompetition agreement from The Press and E. W. Scripps Company restricting the latter from engaging in the publication of any weekly, daily, or Sunday newspaper in the Houston area for a period of ten years. Taxpayer paid The Press a total consideration of $4,500,000, none of which was allocated among the various items prior to the time of sale.

Under the purchase agreement, taxpayer was entitled to receive all subscription lists of *The Houston Press,* and it eventually did receive the lists. The Press had distributed its newspapers by means of district managers. Each manager supervised a specific area and was responsible for distributing newspapers to the paperboys and street vending boxes in his area. The district managers were employees of The Press and maintained the lists of subscribers to *The Houston Press* within their respective areas. The Press maintained a list of the aggregate number of subscribers, but only the district managers maintained lists showing the names and addresses of the subscribers.

Sometime after the sale, taxpayer engaged the services of the firm of Marshall & Stevens, Inc., Valuation Engineers, to evaluate the various assets acquired from The Press. *The Houston Press* had a circulation of approximately 89,000, and the valuation engineers estimated that about 40% of these would

---

1. The Press is a Texas corporation and is a wholly owned subsidiary of E. W. Scripps Company, national publisher of the Scripps-Howard newspapers.

2. The right to use the Scripps-Howard "lighthouse" design, a trademark registered with the United States Patent Office, and the Scripps-Howard slogan was expressly excluded from the conveyance.

become subscribers to *The Houston Chronicle*. The anticipated number of new subscribers, approximately 35,600, was multiplied by the average cost of obtaining a new subscriber, $2.00, to arrive at a total value of the subscription lists of $71,200. That figure is not in dispute.

On the date that the purchase arrangement was announced to the public, March 20, 1964 (which was also the last day *The Houston Press* was published), taxpayer's president directed his staff to attempt to obtain employment contracts from the district managers previously employed by The Press. In compliance with this directive, taxpayer's city manager went to the offices of The Press on March 20, 1964. Through his efforts, at least 24 of the 28 to 30 district managers of The Press signed contracts to become independent contractors with taxpayer. In essence, then, taxpayer ultimately acquired virtually all of the distribution structure that The Press had utilized.

Taxpayer had agreed to complete all subscriptions to *The Houston Press,* and in addition, taxpayer furnished former subscribers to *The Houston Press* with one month's free delivery of *The Houston Chronicle* in order to acquaint them with that newspaper. As a result of these various efforts, approximately 36,000 Press subscribers ultimately began subscribing to *The Houston Chronicle.*

Because taxpayer had no intention of continuing publication of *The Houston Press,* it did not consider the subscription lists to be self-regenerating assets and considered them valuable only to the extent they furnished names and addresses of prospective subscribers to *The Houston Chronicle.* Concluding that the expected useful life of the lists was five years, taxpayer claimed as an amortization deduction for the taxable years here in question, 1964 and 1965, one-fifth of the assigned value per year.

In connection with an audit of taxpayer's income tax returns, the Commissioner disallowed the amortization expense deductions claimed for the subscription lists. Taxpayer paid the resulting deficiencies and filed claims for a refund, which were ultimately unsuccessful. Taxpayer thereafter filed the instant suit for a refund.

### B. Action Below

Taxpayer's position is that it may claim an amortization deduction under § 167(a) of the Internal Revenue Code of 1954 for the subscription lists, an intangible capital asset, if the asset has (1) a limited useful life that is (2) of ascertainable duration. The government admits that those two qualities generally do allow an intangible capital asset to qualify for such a deduction but insists that subscription lists must be treated as being akin to the "goodwill" of a business, which is non-amortizable as a matter of law. The court below agreed with taxpayer and heard evidence on the question of whether these lists had ascertainable limited lives.

In addition to arguing that these subscription lists were non-amortizable as a matter of law, however, the government argued at the close of the evidence that taxpayer had failed to produce that quantum of evidence that would entitle it to go to the jury under Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365. The trial court again agreed with taxpayer and ruled that the evidence adduced was sufficient to prevent a directed verdict for the government and submitted the case to the jury on special issues.

The jury was first asked to allocate a portion of the purchase price to various assets and items. Their verdict on this issue was as follows:

| | |
|---|---|
| (a) Goodwill | $775,400 |
| (b) Covenant not to Compete | $1,809,400 |
| (c) Library or Morgue | $350,000 |
| (d) Subscription List | $71,200 |

In addition, the jury specifically found that "on March 20, 1964, the subscrip-

tion list had a reasonably ascertainable useful life . . . [of] 5 years."

The government filed a motion for judgment notwithstanding the verdict and renewed in support thereof its arguments that subscription lists are non-amortizable as a matter of law and that even if such lists sometimes are amortizable, taxpayer had not satisfied its burden of producing sufficient evidence to support the jury's verdict. This motion was denied and judgment was entered for taxpayer. The government brings this appeal and again presents its dual argument that the subscription lists in question do not entitle taxpayer to claim an amortization expense deduction.

### C. Whether Newspaper Subscription Lists Are Non-Amortizable as a Matter of Law

The government does not contend that these newspaper subscription lists are non-amortizable because they are *intangible* capital assets. Indeed, it could not, for we have previously said:

"Under the present law, a reasonable amortization deduction is allowed for the exhaustion, wear and tear of property used in the taxpayer's business, or of property held for the production of income, I.R.C. § 167(a) (1954). The property, to be depreciable, must be an inherently wasting asset, but this allowance is not limited to tangible assets."

Griswold v. Commissioner, 5 Cir. 1968, 400 F.2d 427, 433. Also, the Treasury Regulations specifically provide for amortization or depreciation of intangible capital assets:

"If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No al-

lowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. . . ."

Treas.Reg. § 1.167(a)–3. On the other hand, not every intangible capital asset is depreciable:

"Thus the statute does not include all property. There are even some kinds of property used in business on which depreciation is not allowable because none is sustained, and other property on which it is not allowable because any exhaustion which may occur is not susceptible of accurate measurement. Accordingly, in order to establish the right to depreciation, it is necessary to show that the property, whether tangible or intangible, will become exhausted within a definite period, which is known as its useful life, and which can be ascertained from specific terms, such as a contract, or can be determined from available facts."

Pohlen v. Commissioner, 5 Cir. 1948, 165 F.2d 258, 259.

Taxpayer admits that it bears all burdens in regard to establishing its right to claim a § 167(a) deduction. *See* Bennett v. Commissioner, 8 Cir. 1944, 139 F.2d 961; Pohlen v. Commissioner, *supra.* This being so, taxpayers frequently are prevented from taking § 167(a) deductions because they are unable to prove affirmatively that the particular asset involved satisfies all of the prerequisites for amortizability. Many of the reported cases turn on this factual question and thus stand not so much for the proposition that the type of asset is never amortizable as they do for the conclusion that the very asset involved failed to qualify for one or more particular reasons.

Thus, in KWTX Broadcasting Co. v. Commissioner, 5 Cir. 1959, 272 F.2d 406, affirming 31 T.C. 952, we affirmed the disallowance of a § 167(a) deduction for the costs of obtaining a three-year li-

cense from the Federal Communications Commission to operate a television broadcasting station. Our holding was squarely grounded on the fact finding that the FCC "has never refused to grant a renewal of a license once it has been granted." 272 F.2d at 407 n. 1. Rather than being of ascertainable life, a prerequisite to depreciability, the asset was specifically considered to be of indefinite duration. *See also* Richmond Television Corp. v. United States, 4 Cir. 1965, 354 F.2d 410; Commissioner v. Indiana Broadcasting Corp., 7 Cir. 1965, 350 F.2d 580, cert. denied, 382 U.S. 1027, 86 S.Ct. 645, 15 L.Ed.2d 539. Similarly, in Nachman v. Commissioner, 5 Cir. 1951, 191 F.2d 934, affirming 12 T.C. 1204, we refused to allow the costs of obtaining a retail liquor license valid for only five months to be depreciated. Permitting the taxpayer to deduct the "official fee" as an ordinary and necessary business expense, we denied a depreciation deduction for the "premium" paid for the license because the licenses involved "were assignable, and carried with them valuable renewal privileges, as it was the established practice in issuing renewal licenses from year to year to prefer the holders of existing licenses over other applicants." 191 F.2d at 935. Again, even though the asset had a known "expiration date," the government was able to prevail by satisfying the trier of fact that the useful life of the asset was likely to continue indefinitely. *See also* Curry v. United States, 4 Cir. 1962, 298 F.2d 273 (contract to furnish electricity "in perpetuity free of all cost" is facially of indefinite duration).[3] None of these decisions control the instant case, however, for we have before us a jury's determination that this asset has a limited useful life of five years rather than a fact finding that the subscription lists will continue their usefulness indefinitely.

The most frequently reported cases—those involving denials of § 167(a) amortization deductions for intangible capital assets where the taxpayer failed to carry his burden of convincing the trier of fact that the asset has a limited useful life of ascertainable duration—are similarly distinguishable. In denying a § 167(a) deduction in Griswold v. Commissioner, *supra,* for example, we emphasized that taxpayers had "offered no evidence to accurately establish the duration of the assets." 400 F.2d at 434. Similarly, in a case involving "insurance renewals," we denied amortization deductions where taxpayers had "adduced no controverting evidence of a limited useful life" of the asset. Salome v. United States, 5 Cir. 1968, 395 F.2d 990.

Indeed, most of the cases denying § 167(a) deductions to intangibles clearly rest on a failure of the taxpayer to carry his burden of proof. In International Textbook Co. v. United States, 1930, 44 F.2d 254, 71 Ct.Cl. 132, taxpayer had incurred substantial expenses in obtaining the right to market certain educational programs. In denying a depreciation deduction in connection with this asset, the court found that the rights were of indefinite duration and noted that taxpayer had failed to provide any "basis for the computation of exhaustion" of the asset. 44 F.2d at 257. In Dunn v. United States, 10 Cir. 1969, 400 F.2d 679, the court held that various payments made in connection with a "Dairy Queen" franchise were non-amortizable where no certain life of the franchise agreement had been shown. The court in Gant v. Commissioner, 6 Cir. 1959, 263 F.2d 558, pinioned its refusal to allow the purchaser of a distributorship to amortize monthly payments to the seller on the fact finding that the future period of the arrangement was "entirely unascertainable." 263 F.2d at 559. A claimed depreciation deduction was dis-

---

3. The costs of acquiring leases and similar assets that may be renewed and extended indefinitely have been held not entitled to amortization deductions. *See* Shufflebarger v. Commissioner, 1955, 24 T.C. 980 (grazing preferences); Scalish v. Commissioner, 1962, 21 T.C.M. 260 (vending machine locations).

allowed for a somewhat different reason in Klein v. Commissioner, 2 Cir. 1966, 372 F.2d 261. Taxpayer furnished exterminating and pest-control services, and he expanded his business by buying the accounts of other exterminators. His attempt to depreciate the cost of those purchases was thwarted when he failed to satisfy § 167(a)'s requirement that he establish the cost basis of the asset.[4] Each of these cases represents the failure of a given taxpayer to carry his burden of bringing his claim within the *factual* borders that would support an amortization deduction—none rules that the asset involved is *per se* non-amortizable.

Some intangible capital assets are, of course, non-amortizable as a matter of law, with the most frequently litigated example being the "goodwill" of an ongoing business. Treasury Regulation § 1.167(a)–3 specifically provides, "No deduction for depreciation is allowable with respect to goodwill," and the cases are consistent in applying that regulation strictly. *E. g.*, Winn-Dixie Montgomery, Inc. v. United States, 5 Cir. 1971, 444 F.2d 677; United States v. Cornish, 9 Cir. 1965, 348 F.2d 175; Dodge Brothers, Inc. v. United States, 4 Cir. 1941, 118 F.2d 95. Indeed, this proposition is so well settled that the only question litigated in recent years regarding this area of the law is whether a particular asset is "goodwill."

We have previously spoken at length to the question of what constitutes goodwill:

> "[T]he nature of goodwill . . . is the expectancy that 'the old customers will resort to the old place.' Commissioner of Internal Revenue v. Killian, 314 F.2d 852, 855 (C.A.5, 1963); Nelson Weaver Realty Co. v. Commissioner of Internal Revenue, 307 F.2d 897, 901 (C.A.5, 1962); Karan v. Commissioner of Internal Revenue, 319 F.2d 303, 306 (C.A.7, 1963).

> '[T]he essence of goodwill is the expectancy of continued patronage, for whatever reason.' Boe v. Commissioner of Internal Revenue, 307 F.2d 339, 343 (C.A.9, 1962) . . . . [T]o the extent [a given item or asset] contributes to the expectancy that the old customers will resort to the old place it is an element of goodwill. Commissioner of Internal Revenue v. Seaboard Finance Co., 367 F.2d 646, 651 n. 6 (C.A.9, 1966); Boe v. Commissioner of Internal Revenue, *supra*, 307 F.2d at 343.

> ". . .

> "This Court has held that . . . goodwill is acquired by the purchaser of a going concern where the 'transfer enables the purchaser to step into the shoes of the seller.' Balthrope v. Commissioner of Internal Revenue, 356 F.2d 28, 32 n. 1 ([C.A.5] 1966); Masquelette's Estate v. Commissioner of Internal Revenue, 239 F.2d 322, 325 ([C.A.5] 1956). We have also said that goodwill is transferred where, as here, the buyer continues the seller's business uninterrupted, using primarily the seller's employees, and utilizing the seller's name. Barran v. Commissioner of Internal Revenue, *supra*, 334 F.2d 58, 61 ([C.A.5] 1964). It is immaterial that the agreement did not use the term 'goodwill,' for '[t]he use of these words is, of course, not necessary if in fact what is transferred does give to the purchaser everything that can effectively aid him to step into the shoes of the seller.' Masquelette's Estate v. Commissioner of Internal Revenue, *supra*, at 325; see also Barron v. Commissioner of Internal Revenue, *supra*, at 61. . . ."

Winn-Dixie Montgomery, Inc. v. United States, *supra*, 444 F.2d at 681–682. Thus, the precise issue is often whether or not the asset involved is either ordinary goodwill or so much like goodwill that the reasons for denying amortiza-

---

4. The court also gave as an additional reason for denying the deduction taxpayer's failure to establish "when an account's useful life has come to an end." *Id.*, 372 F.2d at 262.

tion deductions for goodwill are fully applicable. Foremost among those reasons is the conclusive presumption that goodwill is a non-depreciating capital asset. *See, e. g., Id.*; Golden State Towel & Linen Service, Ltd. v. United States, 1967, 373 F.2d 938, 179 Ct.Cl. 300. Viewed in a business context, the economic value of a taxpayer's continuing goodwill within his field of operations is seen as an ongoing asset that fluctuates but does not necessarily diminish.[5] The crucial question becomes one of asking whether the intangible capital asset involved necessarily possesses similar characteristics.

Many reported cases apply this analytical approach. Clark Thread Co. v. Commissioner, 3 Cir. 1939, 100 F.2d 257, is an early example. Taxpayer had incurred expenses in securing a competitor's agreement to discontinue using the trade name "Clark." When taxpayer attempted to treat this cost as a business expense deduction, the court looked to the substance of the transaction and concluded that taxpayer had acquired the right to use the trade name free of competition. The deduction was disallowed because trade names are like goodwill in their economic characteristics and effect. Both may vary in value through the years, but both will be of ongoing usefulness indefinitely, presumptively for as long as the business continues to operate. In J. C. Cornillie Co. v. United States, E.D.Mich.1968, 298 F.Supp. 887, a contract under which fuel oil customers would be referred to taxpayer by a former supplier was held to constitute the purchase of goodwill, and the claimed deduction was accordingly disallowed. What taxpayer had obtained was the ongoing expectation that customers would utilize its services in the future, the archetypical element of goodwill. In Falstaff Beer, Inc. v. Commissioner, 5 Cir. 1963, 322 F.2d 744, taxpayer attempted to treat the cost of purchasing an existing marketing structure as an ordinary business expense deduction under § 162 of the Internal Revenue Code. Recognizing that what was actually transferred was the seller's goodwill, we found the purchase price to be a capital investment that "unquestionably added value, permanently or at least for many years" to the purchaser's business, 322 F.2d at 748, and we therefore denied the § 162 deduction. In Sammons v. Commissioner, 7 Cir. 1949, 177 F.2d 837, the cost of obtaining existing "Who's Who" biographical sketches was found to be allocable, as a factual matter, to goodwill and other non-deductible intangibles.

None of the foregoing cases supports the government's argument that subscription lists are non-amortizable as a matter of law. Nor does the case most closely in point to the one before us support the government's position. In Blaine v. United States, 5 Cir. 1971, 441 F.2d 917, taxpayer attempted to depreciate the cost of obtaining "insurance expiration" lists and a covenant not to compete from the seller.

"The Commissioner disallowed the depreciation deductions for the stated reason that [lists of] insurance expirations do not have a reasonably ascertainable useful life, and are in the nature of goodwill. The taxpayers paid the resulting deficiencies, and filed a claim for a refund. The refund claims were disallowed. Suit for refunds was brought in the district court. The jury returned a special

---

5. The government's brief summarizes this position as follows:

"Since the nature of goodwill is the expectancy that old customers will resort to the old places and the expectancy of continued patronage . . . the term goodwill, for tax purposes, encompasses a wide spectrum of intangibles which are associated with favorable customer patronage. . . . Thus, goodwill is the sum total of all the imponderable qualities which attract customers and bring patronage to the business. By its very nature, goodwill is not a depreciable asset since it is self-regenerating and its benefits extend over a substantial period of time which cannot be estimated with reasonable accuracy."

verdict finding that the expirations involved had a useful life of six years. Judgment was entered for tax refunds reflecting the allowance of . . . depreciation deductions over a six year period. Motion for judgment notwithstanding the verdict was made and overruled. The United States brings this appeal contending that insurance expirations are goodwill . . . and not depreciable as a matter of law, and even if they are depreciable the finding of a useful life of six years is clearly erroneous. . . ."

441 F.2d at 918. Although we reversed the case, we did so only on the ground that taxpayer had failed to produce that quantum of evidence that would withstand a motion for judgment notwithstanding the verdict under Boeing Co. v. Shipman, *supra*. In other words, we refused to find that the lists there involved were non-amortizable as a matter of law; to the contrary, we treated the issue is a factual question, *i. e., whether* the limited and ascertainable lives of the intangibles had been proven by sufficient competent evidence.

The government's posture in the instant case is on all fours with the position it took in Blaine v. United States, *supra*. That case alone would control our disposition of the question of whether such lists are non-amortizable as a matter of law were it not for the fact that the government here raises an argument not discussed in *Blaine*. As a refinement of its argument that lists such as those before us are to be treated as goodwill for tax purposes, the government argues that the so-called "mass asset" or "indivisible asset" rule requires that amortization be denied.

The "mass asset" rule has been applied where arguably distinct assets are "inextricably" linked to goodwill, *see* Golden State Towel & Linen Service, Ltd. v. United States, *supra,* and where

the seemingly separate assets possess the same qualities as goodwill, possessing no determinable useful life and having self-regenerating capability,[6] *see* Winn-Dixie Montgomery, Inc. v. United States, *supra*. The government here invokes that "rule" to insist that the instant taxpayer cannot amortize the cost of obtaining these lists. We cannot agree, and we do not read the "mass asset" cases as controlling this case.

Most of the cases purporting to apply the "mass asset" rule involve evidentiary failures on the part of the taxpayer. In Thrifticheck Service Corp. v. Commissioner, 2 Cir. 1961, 287 F.2d 1, the amount paid for customer contracts was not entitled to be deducted as a depreciable expense and was instead lumped together into one non-depreciable asset that included the expectation of future business coming to taxpayer. The holding rested squarely on the failure of taxpayer to prove a reasonable period over which the amounts should have been amortized, and the case stands for little more. Similarly, in Marsh & McLennan, Inc. v. Commissioner, 3 Cir. 1969, 420 F.2d 667, the cost of acquiring "insurance expiration" lists was not allowed to be depreciated. The court rested its holding on two findings: "first, the expirations were inextricably linked with elements of goodwill such that they had no determinable value in themselves; and second, the taxpayer had not proved that the expirations had a limited useful life, determinable with 'reasonable accuracy.'" 420 F.2d at 667. The dissenting opinion of Judge Van Dusen characterized these fact findings as being "clearly erroneous" and emphasized that the "mass asset" rule turns on factual questions.[7] Without compiling the myriad cases that discuss the "mass asset" rule, we are satisfied that the rule does not establish a *per se* rule of non-amortizability in every case involving both goodwill and other intangi-

---

6. *See* note 5 *supra*.

7. The dissent also discussed some of the problems with the "mass asset" rule. *See* 420 F.2d at 672–673 n. 3.

ble assets. In the light of § 167(a) of the Code and Regulation § 1.167(a)–3, we are convinced that the "mass asset" rule does not prevent taking an amortization deduction if the taxpayer properly carries his dual burden of proving that the intangible asset involved (1) has an ascertainable value separate and distinct from goodwill, and (2) has a limited useful life, the duration of which can be ascertained with reasonable accuracy.

Where the taxpayer has been able to satisfy this perhaps extremely difficult burden, depreciation expense deductions have been allowed. In Western Mortgage Co. v. United States, C.D.Cal.1969, 308 F.Supp. 333, the taxpayer established that loan service contracts carried with them no expectancy of continued patronage or repeat business, and in addition, proved that as a result of the contracts it would

> "receive a determinable amount of income over a 'limited period, the length of which can be estimated with reasonable accuracy.' Treasury Regulations, Section 1.167(a)–3 (1954). The parties stipulated that the . . . loans had an average life of 7 years. This average life complies with Treasury Regulations, Section 1.167(a)–3 1954). . . . Accordingly, plaintiff is entitled to amortize over a 7-year period that portion of the purchase price properly allocable to the right to service the . . . loans."

308 F.Supp. at 340–341. In Commissioner v. Seaboard Finance Co., 9 Cir. 1966, 367 F.2d 646, affirming T.C. Memo. 1904–253, the "premium" paid for acquiring outstanding loans and other assets was found to be amortizable. The Commissioner had argued that the entire premium was allocable to goodwill and other non-depreciable assets, but the taxpayer was able to obtain a fact finding that only 30% of the premium was allocable to those items. Accordingly, when taxpayer established the value and reasonably ascertainable useful life of the remaining 70% attributable to the

loan accounts, the claimed deduction was allowed.

Two Sixth Circuit cases relied upon by the government also demonstrate that the amortizability of a given intangible capital asset turns on its *factual* characteristics. Both Skilken v. Commissioner, 6 Cir. 1969, 420 F.2d 266 (terminable-at-will vending machine locations), and Toledo Blade Co. v. Commissioner, 6 Cir. 1950, 180 F.2d 357, affirming 11 T.C. 1079 (transfer of newspaper's intangible assets, including covenant not to compete), denied amortization expense deductions. In both cases, however, the taxpayer had failed to establish one or more of the factual prerequisites to amortizability—no ascertainable useful life was shown in *Skilken* and no definite value was shown in *Toledo Blade.*

Only in the Eighth Circuit has the position here urged by the government been approached. Willcuts v. Minnesota Tribune Co., 8 Cir. 1939, 103 F.2d 947, denied ordinary expense deductions to the cost of purchasing another newspaper's circulation, but the court made clear that taxpayer's failure to carry the evidentiary burdens compelled that result:

> "The record is entirely silent on [the actual costs and values involved]. The assessment of the Commissioner of Internal Revenue is, however, presumptively correct. The burden of proof was on the taxpayer to overcome this burden. . . ."

103 F.2d at 951. *See also* National Weeklies v. Commissioner, 8 Cir. 1943, 137 F.2d 39, 42 (no depreciation deduction for newspaper subscription lists where "the evidence in any event failed to establish the depreciation basis necessary"). Meredith Publishing Co. v. Commissioner, 8 Cir. 1933, 64 F.2d 890, denied ordinary expense deductions to the cost of building up a magazine's circulation, but the case involved a situation where taxpayer was claiming and receiving annual deductions for the cost of replacing each subscription that expired. More recently, however, the

Eighth Circuit has allowed expenses incurred in obtaining intangible capital assets used in the trade or business to be depreciated where the proper supportive facts are present. *See* Northern Natural Gas Co. v. O'Malley, 8 Cir. 1960, 277 F.2d 128. As the concurring opinion of then-Circuit Judge Blackmun makes clear, if the asset is shown to be a wasting one used in taxpayer's trade or business, a reasonable deduction must be allowed. 277 F.2d at 139–141.

Finally, we note that even the Tax Court, which in several early cases denied depreciation deductions for customer lists involved in particular situations, *see, e. g.,* Anchor Cleaning Service, Inc. v. Commissioner, 1954, 22 T.C. 1029; Danville Press, Inc. v. Commissioner, 1925, 1 B.T.A. 1171; Herald-Despatch Co. v. Commissioner, 1926, 4 B.T.A. 1096, has recently allowed the cost of customer lists to be depreciated in Manhattan Co. of Virginia, Inc. v. Commissioner, 1968, 50 T.C. 78. In that case, the court allocated the purchase price to various specific intangible assets. Finding that "75 percent of the cost . . . of the customer lists is allocable to the depreciable part of the intangible asset consisting of the information acquired by [taxpayers] from the customer lists which enabled them to contact customers . . . and in many instances to obtain their business," 50 T.C. at 93, the court concluded:

> "The record here shows that of the typical customers acquired by [taxpayers] from the . . . lists, they could expect to lose approximately 20 percent a year. From this and the other evidence in this record, we conclude that from the experience of [taxpayers] the information on the customer lists which had a limited useful life had such a useful life of approximately 5 years. We therefore conclude that the 75 percent of the

cost of the customer lists which we have allocated to an intangible asset of a wasting nature should be depreciated on a 5-year basis."

*Id.*[8] *See also* First Pennsylvania Banking & Trust Co. v. Commissioner, 1971, 56 T.C. 677.

■ Finding that the instant lists met the requirements of § 167(a) of the Code and the Regulations promulgated thereunder, we explicitly hold that which we left unsaid in Blaine v. United States, 5 Cir. 1971, 441 F.2d 917—newspaper subscription lists such as those before us are intangible capital assets that may be depreciated for tax purposes if taxpayer sustains his burden of proving that the lists (1) have an ascertainable value separate and distinct from goodwill, and (2) have a limited useful life, the duration of which can be ascertained with reasonable accuracy. *Cf.* Commissioner v. Killian, 5 Cir. 1963, 314 F.2d 852. Therefore, as we did in *Blaine,* we must now turn to a consideration of whether the instant findings supporting amortizability, *i. e.,* the jury's verdict, can withstand appellate review.

## D. *Whether the Jury's Verdict Is Sufficiently Supported by the Evidence*

The dispositive findings made by the jury in its special verdict were (1) that the lists here involved had a separate value of $71,200, and (2) that the lists "had a reasonably ascertainable useful life . . . [of] 5 years." The government does not challenge the first finding but insists that insufficient evidence was before the jury from which the second finding could have been made. If the evidence was insufficient, the government's motions for a directed verdict and for judgment notwithstanding the verdict should have been granted. We hold that the trial judge correctly determined that the evidence was

---

8. Thoms v. Commissioner, 1968, 50 T.C. 247, decided less than a month after *Manhattan Co. of Virginia, Inc.,* seems to be yet another case of a claimed depreciation deduction for insurance expiration lists being denied because taxpayer failed to carry his burden of proof. *See id.,* 50 T.C. at 254–255. *See also* Squires v. United States, C.D.Cal.1968, 289 F.Supp. 597 (findings ## 24–26).

sufficient to entitle taxpayer to submit the case to the jury.

The general standard to be applied in testing the merit of such motions was clearly stated in Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374–375:

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the nonmover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses."

Additionally, for § 167(a) cases, the Treasury Regulations provide, "No allowance will be permitted [for intangible capital assets] merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life." Treas. Reg. § 1.167(a)–3.

Because so few taxpayers have obtained favorable findings in cases such as the one before us, there is a paucity of reported cases discussing the level of evidence that must be surpassed if a favorable finding is to withstand appellate review. In addition to the scores of cases applying Boeing Co. v. Shipman, *supra,* two tax cases involving this very issue are particularly instructive. First, in Blaine v. United States, 5 Cir. 1971, 441 F.2d 917, we found that the evidence adduced was insufficient to support the jury's verdict in favor of taxpayer. Finding much of the evidence regarding the useful life of the disputed asset to be without legal bearing, we characterized the remaining evidence as "opinions unsupported by facts of substance and materiality. . . ." 441 F.2d at 919. Thus, we held that Boeing Co. v. Shipman, *supra,* had not been satisfied, and we reversed with directions that judgment be entered for the government.

On the other hand, in Manhattan Co. of Virginia, Inc. v. Commissioner, 1968, 50 T.C. 78, the Tax Court found that the following evidence was competent on the depreciability issue:

—testimony that the lists could be assigned a value separate from the other assets acquired;

—testimony that the cost of the lists correllated with anticipated revenues, computed on a per customer average;

—testimony regarding taxpayer's normal attrition rate, which averaged 20% per year; and

—evidence that 25% of the value of the lists would continue indefinitely and that the remaining 75% would become valueless at the normal attrition rate.

Finding this evidence properly relevant to the inquiry at hand—*i. e.,* whether

this particular asset was factually a wasting asset to which a value could be assigned and whether the limited useful life of the asset could be ascertained with reasonable certainty—the Tax Court allowed taxpayer to depreciate 75% of the costs of the list over a five-year period. 50 T.C. at 92–94.

■ We have parsed and thoroughly scrutinized the record produced in the instant case, and we find in it sufficient evidence to defeat the government's motions and to sustain the jury's verdict. Of particular importance, we find, *inter alia*:

—testimony from taxpayer's officers and employees, based upon their experience as publishers of an afternoon newspaper in the Houston area, regarding the cost of obtaining new subscriptions;

—corroborative testimony from the valuation engineers, based upon their study, discussed *supra*;

—testimony from taxpayer's officers and employees, again based on their experience, regarding the anticipated useful life of a subscription list used in connection with the publication of an afternoon newspaper in the Houston area;

—corroborative testimony from the valuation engineers, again based upon their study; and

—the results of a survey of *The Houston Chronicle's* current subscribers regarding the useful life of an average subscription, and testimony connecting the survey with *The Houston Press* subscription lists, *i. e.*, testimony that conditions in the afternoon newspaper market in the Houston area had not been materially altered during the years in question.

We think that this direct testimony rises above the level of "unsupported opinion of the taxpayer" and thus satisfies both Treas.Reg. § 1.167(a)–3 and Boeing Co. v. Shipman, *supra*, and we conclude that the very able trial judge correctly submitted the case to the jury. The government's remaining objections on this issue pertain to the weight that should have been given to this testimony, but as we have said before:

"It is not our function to comment upon the weight of [the] evidence, nor are we in a position to say how we would decide the case were we the jurors. It is for the jury, once competent evidence has been introduced from which the necessary facts can be found, 'to weigh conflicting evidence and inferences and determine the credibility of witnesses.' Boeing Co. v. Shipman, 411 F.2d at 375.

". . . In a case such as we have here, where shades of evidence have been produced on opposite sides of [the] issue, jury exile should be almost as rare as a museum piece. . . ."

Jones v. Concrete Ready-Mix, Inc., 5 Cir.1972, 464 F.2d 1323, 1326. This issue having been properly submitted to the jury, and the jury having found the controlling facts from competent evidence, this issue will be affirmed.

*E. Conclusion*

Judicial tolerance compels us to say that many jurists and scholars could diagnose tax non-depreciability in the muscles and tendons of list transactions. We reject, however, the establishment of a *per se* rule and a monolithic "mass asset" theory that would amalgamate all subscriptions lists with goodwill.

■■ Our view—that amortizability for tax purposes must turn on factual bases—is more in accord with the realities of modern business technology in a day when lists are bartered and sold as discrete vendible assets. Extreme exacti-

tude in ascertaining the duration of an asset is a paradigm that the law does not demand. All that the law and regulations require is reasonable accuracy in forecasting the asset's useful life.

■■■ The burden to prove that an asset qualifies for tax amortizability is cast upon the taxpayer, and this taxpayer has manfully carried that heavy load as weighed by the jury. After studying the Code, Regulations, cases, testimony, and the jury's verdict, all in the light of the trial judge's meticulously thorough instructions,[9] we can find no Achilles heel to the amortizability of these subscription lists.

## II. TAX TREATMENT OF THE LEASE ACQUISITION COSTS

The second major issue presented by this appeal concerns the tax treatment to be accorded taxpayer's expenditures to terminate outstanding leaseholds on property it had recently purchased. Unlike the first issue, the facts giving rise to this question are largely undisputed.

### A. The Operative Facts

On September 21, 1964, taxpayer purchased a fee title interest in the Rice Institute Building in Houston, Texas. On October 4, 1965, taxpayer purchased fee title interests in three other pieces of real property located in the same block in Houston: the Travis-Prairie Company Building, the J. Weingarten Building, and the Snyder Building. Each of these interests was purchased subject to outstanding leases, the average unexpired term of which was 45 months. On October 4, 1965, taxpayer also purchased all

---

**9.** Judge Singleton's instruction read in pertinent part:

"In your deliberations relating to this matter of depreciation, you must keep two principles in mind. First, no depreciation deduction is allowable for intangible assets unless the asset is the sort of thing which declines in value. This is true because no depreciation deduction is allowable unless the asset actually depreciates in value over a period of time. Second, for a depreciation deduction to be allowed, the useful life of the asset must be capable of being estimated with reasonable certainty. Thus, in the case of a machine, experience will establish that it has an expected useful life of so many years. This, then, becomes the period over which the value of the asset may be depreciated. The term 'useful life' means the period over which the asset may reasonably be expected to be useful to the Plaintiff. In this case you must decide whether the various intangible assets bought by the Plaintiff did diminish in value and, if so, whether their expected useful life can be estimated with reasonable certainty.

"  .  .  .

"The comments I just made with respect to the Press library apply also to the value of the circulation rights, if any, obtained by the Chronicle from The Houston Press. If you find that the circulation rights obtained by the Chronicle had value, you must make your decision as to the amount of value that they possessed on March 20, 1964. Then, you must also decide whether the useful life of these subscription rights could be estimated with reasonable accuracy. As a matter of law the useful life of circulation rights is not ordinarily limited. Again, you may not find that the subscription rights had a limited useful life based merely upon the unsupported opinion of the employees of the Chronicle.

"The Chronicle claims that the subscription rights were worth $71,200.00, while the Government claimed they had no value separate and apart from the goodwill obtained by the Chronicle from The Press. If you find that the subscription rights did have a value separate and apart from the goodwill, then you should consider whether they had an ascertainable useful life. The Chronicle claims that the subscription rights had a useful life of five years, while the Government claims that the length of the useful lives cannot be estimated with reasonable accuracy."

of these outstanding leasehold interests, paying a total price of $405,000. These transactions are outlined in the following chart:

| Property | Leasehold Owned on Date of Purchase by: | Lease due to Expire on: | Date Fee Interest Purchased: | Date Leasehold Purchased: |
|---|---|---|---|---|
| RICE INSTITUTE BUILDING | J. Weingarten, Inc. | July 31, 1969 | Sept. 21, 1964 | Oct. 4, 1965 |
| TRAVIS-PRAIRIE COMPANY BUILDING | J. Robinowitz, M. Robinowitz, & Robinowitz & Son | July 31, 1969 | Oct. 4, 1965 | Oct. 4, 1965 |
| J. WEINGARTEN BUILDING | J. Weingarten, Inc. | April 30, 1968 | Oct. 4, 1965 | Oct. 4, 1965 |
| SNYDER BUILDING | J. Weingarten, Inc. | May 31, 1970 | Oct. 4, 1965 | Oct. 4, 1965 |

[A9035]

Taxpayer demolished the existing buildings between July and November of 1966 and subsequently erected a new building on the site.

In reporting its income for 1965, taxpayer claimed an amortization expense deduction in the amount of $27,000, which it claimed represented an allowable amortization of the consideration paid to acquire the leasehold interests. This amount was computed by amortizing the total amount paid, $405,000, over the average unexpired term of the leases, 45 months.[10]

In connection with the audit of taxpayer's income tax returns, discussed *supra,* the Commissioner disallowed the amortization expense deduction claimed for the leasehold interests. Taxpayer paid the resulting deficiencies and filed its claim for a refund, which was denied, and the instant suit followed.

### B. Action Below

Taxpayer's position is that it is entitled to an amortization deduction under § 167(a) of the Code for the cost of acquiring the outstanding leasehold interests and that the proper period over which the amortization should be computed is 45 months, the average unexpired term of the leases. Taxpayer summarizes its argument as follows:

"This contention is supported by a long line of cases beginning with Henry B. Miller, [10 B.T.A. 383 (1928)]. In that case the taxpayer unsuccessfully contended that the expenditures incurred for the cancellation of outstanding leasehold interests were deductible in the year of the expenditures as ordinary and necessary business expenses. The court held that the taxpayer, in acquiring the leasehold interest, had acquired a capital asset and that the cost of such acquisition should be amortized over the useful life of that asset, i.e., the unexpired term of the lease. The court stated:

Prior to the acquisition of the outstanding leasehold by the lessor, his rights to the use and possession of the premises so leased were lim-

10. Taxpayer reported three months' depreciation for the taxable year, computed at $9,000 per month.

ited by the lease. As the result of the expenditure he acquired for himself the six-year leasehold right therefore vested in the lessee and by so doing he, for a sufficient interval of time, became his own lessee. True, the law presumes the merger of the two interests, but before that can occur the lessee's interest must vest in the lessor. The amount thus expended is a capital expenditure made in order to obtain a possession of premises for a period prior to the time the petitioner would have come into possession under the terms of the lease and affords to him no benefits beyond the period which payment is made. The amount so expended was paid for the right to enjoy a possession of the premises for the unexpired term of the lease—that is to say, it is an amount expended in the acquisition of a capital asset having a life of a definite number of years. The petitioner's right to spread the cost of the acquisition of the capital asset over its life and deduct annually an aliquot part thereof is not affected by the subsequent merger of the interest thus acquired with the fee interest theretofore held by him. 10 B.T.A. at 384–85."

The government argues that the cost of acquiring the leasehold interests should be added to taxpayer's "basis" in the *land*. Under the government's view of the case, which it summarizes as follows, taxpayer could claim no amortization deduction whatsoever:

"Expenditures connected with the acquisition of a capital asset are added to the cost of the 'capital asset. Whether these costs are depreciable or amortizable, or recoverable only upon sale of the asset in a taxable transaction, depends upon the nature of the capital asset. Since land is not depreciable, costs associated with its acquisition are reflected in an increased basis on sale."

"It is the Government's position that the taxpayer's purchase of land and acquisition of the leasehold interests thereon were related transactions constituting together, in substance, the total cost of the land, and that the analogous rules applicable to [demolition] losses should control. In order to construct its new building, taxpayer needed possession of the unencumbered land. The demolition costs (including taxpayer's basis in the old structures), which are required to be added to the basis in the land, enabled taxpayer to take possession free of physical obstructions. In a similar fashion, the leasehold cancellation payments allowed taxpayer to take possession free of legal encumbrances. Moreover, the two payments accomplished what would normally be accomplished by an outright purchase of property, i.e., full ownership and immediate possession. Since depreciation or amortization is not allowed where a single payment is made to accomplish this end, there is no reason to allow a deduction where several payments are necessary to acquire the land in its unencumbered state."

By pretrial order, the parties agreed that the question of how to treat the leasehold acquisition costs for tax purposes should be decided by the court based upon the pleadings, affidavits, and stipulated facts. The court below, 339 F.Supp. 1314 entered findings of fact, which included, in addition to the facts heretofore set out, the following:

"The amounts paid for such leasehold interests were paid by [taxpayer] in order that [taxpayer] might have the right of immediate possession and enjoyment of the premises for business purposes. At the time of the acquisition of such leasehold interests, [taxpayer] intended to demolish [the buildings], and, in fact, [taxpayer] did almost immediately after acquisition of such leasehold interests in said buildings begin demolishing these buildings and did subsequently build

on this site a new building which houses [taxpayer's] business."

The court then rejected both the government's and taxpayer's primary arguments, and, in an exercise of Solomonic wisdom, ruled that the position advanced in the alternative by both parties was correct:

"After considering the stipulated facts and the briefs filed by the parties, this court concludes that the costs of acquiring the outstanding leasehold interests in question *should be amortized over the useful life of the new building* which [taxpayer] constructed on a part of the property that was subject to the leasehold interest." [Emphasis added]

Judgment was entered accordingly, and both parties appeal, each arguing that its primary position should be sustained.

Thus, the issue before us is which of three different theories for the tax treatment of the leasehold acquisition costs is correct. We analyze each of these positions separately, first discussing taxpayer's view of the case, then the government's position, and finally the trial court's theory.

### C. Whether the Leasehold Acquisition Costs are Amortizable Over the Average Unexpired Term of the Leases

Taxpayer essentially argues that because it already owned the underlying fee interest in the land at the time it acquired the leasehold interests, purchasing those intervening leases gave it nothing it did not already own other than the right to *use* the premises during the unexpired term of the leases. Viewing the transactions as the acquisition of a capital asset of known and limited duration, taxpayer seeks to amortize the costs thus incurred over the "useful life" of the asset, *i. e.*, the average unexpired term of the leases. In support of this argument, taxpayer relies heavily on four tax court cases: Henry B. Miller, 1928, 10 B.T.A. 383; Trustee Corporation v. Commissioner, 1954, 42 T.C. 482; Harriet B. Borland, 1933, 27 B.T.A. 538; Laurene W. Berger, 1946, 7 T.C. 1339.

Taxpayer's reliance on the line of authority represented by these four cases is misplaced. The cases are said to stand for the proposition that when the owner of property "encumbered" by existing leasehold interests incurs cost to cancel or extinguish those leases, he may amortize that expense over the unexpired terms of the leases. Although that is indeed the result reached in each of these cases, we have determined that the factual contexts in which they arose fully distinguish those cases from the instant appeal.

In *Henry B. Miller, supra,* the case on which taxpayer places greatest reliance, taxpayer was the fee owner of property subject to a lease having six years to run at a monthly rental of $65. By paying his lessee $10,000, taxpayer was able to procure a cancellation of the existing lease, and taxpayer subsequently leased the premises at a monthly rental of $475. Under the old lease, taxpayer would have received a total of $4,680; under the new lease, assuming it would run for six years without a reduction in the rental rate, taxpayer would receive $34,200. Thus, by spending $10,000 to remove the impediment of the old lease, taxpayer was able to increase his anticipated rental income by $29,520. On these facts, taxpayer sought to deduct the cost of cancelling the lease in the year it was paid, arguing that it was an ordinary and necessary business expense. The tax court disagreed and sustained the Commissioner's argument that the expense was a capital investment recoverable for tax purposes over the period during which it furnished taxpayer a business benefit, *i. e.*, the six years during which taxpayer would otherwise not have been able to receive the increased rental. Interestingly, the dissent either would have spread the amortization over the term of the new lease or would have allowed the lump deduction as an ordinary and necessary business expense. Finding the record to be

insufficient, however, the dissent was unable to decide which of these two courses was correct.

The distinction between *Henry B. Miller* and the case now under consideration is obvious. In *Henry B. Miller*, taxpayer's capital investment brought him a return of income, *through use of the physical asset*, which return of income was increased over the period of the old lease. In the instant case, on the other hand, taxpayer not only did not use the physical asset, it intended to and almost immediately did *destroy* the buildings.

Trustee Corporation v. Commissioner, *supra*, is on all fours with *Henry B. Miller* and is similarly distinguishable. Taxpayer in that case purchased property in fee simple subject to an outstanding leasehold interest. An amount was subsequently paid to the existing lessee for the cancellation of the lease in order to allow the owner to execute a more favorable lease agreement. The Commissioner argued that the cost of cancelling the leasehold interest should have been amortized over the life of the new lease, but the tax court once again held, over a dissent, that the cost was amortizable over the remaining life of the old lease. Again, however, taxpayer there continued to use the physical asset.

In *Harriet B. Borland, supra*, the same result was reached when the owners of leased property expended sums for the cancellation of existing leases in order to lease the premises on different terms, and *Laurene W. Berger, supra*, applies the same approach. In none of these four cases, however, was the physical asset that was freed from the "encumbrance" of the existing lease acquired with the intent that it would immediately be demolished.

■■■ In the instant case, the leaseholds were not cancelled in order that taxpayer might use the buildings in its business or for the production of income; rather, the leases were cancelled in order that taxpayer might demolish the buildings. Amortization requires a using up or "wasting" of an income-producing or business-related asset over an ascertainable period, and taxpayer cannot argue that the asset (*i. e.*, the 45-month unexpired term of the leases on the existing buildings) will "waste" over an ascertainable 45-month period when taxpayer acquired the asset with the very intent of destroying it. There being no controlling or convincingly persuasive authority that would justify taxpayer's amortizing the lease cancellation costs over the unexpired terms of the leases on these facts, we reject taxpayer's argument and turn now to a consideration of the government's argument that taxpayer should not be allowed to amortize or deduct these costs at all.

## D. Whether the Leasehold Acquisition Costs are Non-amortizable

The government raises three different arguments to support its conclusion that the cost of acquiring these leasehold interests is not amortizable and instead should be added to taxpayer's basis in the land, which is a non-amortizable asset. We are not persuaded that any of these theories is correct.

■■■ (1) The government first argues that the cost of cancelling these leases was a cost of acquiring the land itself. Correctly stating that the cost of acquiring a capital asset is added to the taxpayer's basis in that asset, *e. g.*, Woodward v. Commissioner, 1970, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577, and that land is not a depreciable asset for tax purposes, *e. g.*, Bender v. United States, 6 Cir. 1967, 383 F.2d 656, the government insists the only conclusion to be drawn from the instant facts is that the expense of acquiring the leasehold interests was a cost of acquiring the land. We cannot agree. As we discuss at length in § E, *infra*, the cost of acquiring the leasehold interests is more logically a cost of constructing the new building on land that taxpayer already owned, and we defer further discussion of this point until our discussion of the district court's reasoning, § E, *infra*.

(2) The government's second theory is an attempt to analogize the instant case to the situation where a taxpayer purchases real property with an intent to demolish existing buildings. In that circumstance, Treas.Reg. § 1.165–3(a) provides:

> "(a) *Intent to demolish formed at time of purchase.* (1) Except as provided in subparagraph (2) of this paragraph, the following rule shall apply when, in the course of a trade or business or in a transaction entered into for profit, real property is purchased with the intention of demolishing either immediately or subsequently the buildings situated thereon: No deduction shall be allowed under section 165(a) on account of the demolition of the old buildings . . . The entire basis of the property so purchased shall, notwithstanding the provisions of § 1.167(a)–5, be allocated to the land only. Such basis shall be increased by the net cost of demolition or decreased by the net proceeds from demolition."

That regulation applies only to § 165(a) loss deductions, and the analogy the government advances would go too far. We are not here concerned with the tax treatment of demolition costs; rather, we are concerned only with the tax treatment of costs incurred to remove intervening leases in order that the owner of the underlying fee interest might tear down the existing structures and erect a new building. Furthermore, there is no showing here that taxpayer purchased the *fee* interests with an intention of demolishing the existing structures, and even if we assume from the proximity in time of several of the transactions [11] that taxpayer did have that intent as to three of the buildings, no such showing was made as to the fourth.[12] In that regard, this case is more closely analogous to Keiler v. United States, W.D.Ky.1966, 285 F.Supp. 520, affirmed per curiam, 6 Cir. 1968, 395 F.2d 991. In that case, taxpayers did not have an intention to demolish the existing structures at the time they purchased the underlying fee interest, but they did have such an intention at the time they acquired intervening leasehold interests in order to make way for a new building. In the *Keiler* case, the costs of acquiring the intervening leasehold interests were added to the basis of the new building. We have been cited no cases applying the government's analogy, and we see no persuasive reason why we should extend Treas.Reg. § 1.-165–3(a) to cover a deduction claimed under § 167 of the Code.

(3) Finally, the government urges us to view the transactions here involved as being, in substance, a single event. Under this approach, the government would have us hold that a taxpayer should not receive favorable tax treatment solely because he accomplishes in two steps what he would otherwise achieve in a one-step operation. In other words, because the outright purchase of a fee interest with its concomitant right to immediate possession would afford the purchaser no amortization deduction—the entire price being attributable to the land, which is not depreciable—taxpayer should not receive an amortization deduction merely because he purchased the fee interest in one transaction and then purchased the right to immediate possession in a second transaction. This argument would carry more weight had the government alleged that taxpayer had manipulated the purchasing arrangements in order to avoid taxes, or if it had been shown that taxpayer could have accomplished its purposes with one outright transaction, or perhaps even if the sellers of the fee inter-

---

11. *See* chart, § II, A, *supra.* Three of the fee interests were purchased the same day that the leasehold interests were acquired, but the fourth fee interest had been purchased over a year earlier.

12. The trial court's finding of fact on this point is only that "At the time of the acquisition of such *leasehold interests,* [taxpayer] intended to demolish the [buildings]."

ests were identical to the sellers of the leasehold interests.[13] *See* Thalhimer Brothers, Inc. v. Commissioner, 1957, 27 T.C. 733, 739. *See also* Herzberg v. Alexander, W.D.Okl.1933, 5 F.Supp. 334. None of those circumstances are before us, and the record being devoid of any indication that tax avoidance motivated taxpayer's entry into these transactions,[14] we hold only that the government may not, on this record, assign the cost of acquiring the leasehold interests to the cost of the land taxpayer already owned.

*E. Whether the Leasehold Acquisition Costs are Amortizable Over the Anticipated Useful Life of the New Building*

During the trial of this case, both parties raised the identical alternative argument, that the cost of acquiring the leasehold interests should be added to taxpayer's basis in the new building and thus be amortized over the anticipated useful life of that building.[15] In choosing this middle course, the learned trial judge cited two cases, the conclusions and reasoning of which he specifically adopted: Keiler v. United States, W.D.Ky.1966, 285 F.Supp. 520, affirmed per curiam, 6 Cir. 1968, 395 F.2d 991; Third National Bank in Nashville v. United States, 6 Cir. 1972, 454 F.2d 689, affirming M.D.Tenn.1971, 1971–1 U.S. Tax Cases ¶ 9248. We agree that those two cases reflect a sounder approach

than that urged in the primary arguments of the litigants, and we affirm the trial court's decision on this point.

Keiler v. United States, *supra*, involved stipulated facts. Taxpayer there had no intention of demolishing the existing improvements when the fee interest was acquired, but taxpayer did have an intent to demolish the buildings when the intervening leaseholds were acquired. In allowing taxpayer to amortize the cost of obtaining the leasehold interest, the district court adopted the reasoning of Business Real Estate Trust of Boston v. Commissioner, 1932, 25 B.T.A. 191, see 285 F.Supp. at 520–521, and in affirming *Keiler* the Sixth Circuit adopted the reasoning of the lower court. *See* 395 F.2d at 991. Looking to *Business Real Estate Trust of Boston*, we find that it strongly supports taxpayer's position here. In that case, the owner of certain real property was desirous of expanding his land holdings, tearing down existing improvements, and erecting a new structure for income-producing, business purposes. With that intent clearly present, taxpayer acquired the desired additional fee interests. In order to begin construction of the new building, however, taxpayer had to obtain the cancellation of intervening leases on both the old and the newly acquired land. The parties argued positions in many ways identical to those before us in the instant case,[16]

13. Our listing of these few examples of circumstances in which different factors might be relevant should not be considered as indicating that our holding would necessarily be different in those cases or as indicating that there are no other circumstances under which the government might prevail on this theory.

14. As in Third National Bank in Nashville v. United States, 6 Cir. 1972, 454 F.2d 689, the transaction here involved "appears to be a good-faith arms-length business deal." 454 F.2d at 690.

15. The new building was found to have a useful life of 45 years.

16. The government sought to require amortization of the cost of acquiring the leasehold interests over the unexpired terms of the existing leases, taking this position because "the expiration dates of these leases have long since passed, [and therefore] no allowance would be permitted during the taxable years" involved. 25 B.T.A. at 194. The government also raised an argument under the predecessor of Treas.Reg. § 1.165–3(a) that would have denied taxpayer any deduction. Taxpayer argued that the expenditure should be spread over the term of the new lease on the new premises. In addition, the argument that the leasehold acquisition costs should be added to taxpayer's basis in the land was also considered. *See* 25 B.T.A. at 194–195.

but the court there allowed taxpayer to amortize the leasehold acquisition costs over the life of the new building:

> "We do not believe that these expenditures made under the circumstances here present should be added to the cost of the land, title to some of which had been owned in fee long before the transaction arose. Nor were the benefits of the expenditures to inure permanently, or in the cases of the [new] leases over their term. The payments were made to the tenants to obtain immediate possession so that the new building might be erected . . . and for no other purpose. It is the building that is to produce the income and it seems to us both just and reasonable that these expenditures should be added to the building cost and recovered over its life . . . ."

25 B.T.A. at 194.

Third National Bank in Nashville v. United States, *supra,* applies the same reasoning, although the taxpayer there was the owner of a long term lease rather than the owner of the fee interest. *See also* Commonwealth Natural Gas Corp. v. United States, 4 Cir. 1968, 395 F.2d 493, affirming E.D.Va.1966, 266 F.Supp. 298; Bender v. United States, N.D.Ohio 1965, 246 F.Supp. 189.

These cases apply the better rule, which is more logical and more equitable than those urged by the opposing parties. What taxpayer really acquired by his expenditures here was not land, as urged by the government, nor did it acquire an existing leasehold for its own use, as urged by taxpayer. Rather, as the able district judge recognized, these expenditures gave taxpayer the use of land that it already owned for the unchallenged purpose of erecting a new building. The costs are most closely related to the construction of the new building and must therefore be added to taxpayer's basis in that new building. Accordingly, the costs of cancelling the existing leases must be amortized over

the useful life of the new building, and the district court's holding on this issue will also be affirmed.

### III. DEDUCTIBILITY OF ABANDONMENT & DEMOLITION LOSSES: A QUESTION OF "INTENT"

The first major issue raised by this appeal involved a dispute over both the law and the facts, and the second issue was primarily centered around differing views of the governing law. The parties are in basic agreement regarding the law that controls this third and final issue, but they are in sharp disagreement concerning the facts. Agreeing that when a taxpayer acquires and then voluntarily abandons and demolishes a building, he is entitled to claim a loss deduction under § 165 of the Code *unless* at the time he acquired the building he *intended* to abandon or demolish it, the parties are unable to agree as to whether this taxpayer had such an intent when it purchased the Bering-Cortes Building, which it later abandoned and demolished. The issue was submitted to the jury, which found against taxpayer, and this appeal followed.

#### A. The Operative Facts

On April 13, 1962, taxpayer purchased a tract of land adjoining its existing building, together with the improvements thereon, including a building known as the Bering-Cortes Building. The total consideration for this sale was $290,000. The parties have stipulated that $151,426 of this sum is allocable to the building and represents the adjusted basis of the building less its salvage value.

Following the purchase, taxpayer employed a consulting engineer to conduct a detailed examination of the Bering-Cortes Building. The consulting engineer completed his study and submitted an engineering report to taxpayer in November, 1962. Taxpayer's board of directors met on January 28, 1963, and, after referring to the report, resolved

that use of the building was not feasible and that the building should be abandoned. As a result of this action, the building was never used in taxpayer's business.

During the period from September 21, 1964, through October 4, 1965, taxpayer acquired the remaining buildings located in the block surrounding the Bering-Cortes Building. The entire block was razed between July 11 and November 8, 1966, and taxpayer subsequently erected a new building to house its facilities.

In reporting its income for 1963, taxpayer claimed an abandonment loss of $151,426 for the Bering-Cortes Building. The parties agree that this is the correct figure if taxpayer is entitled to a loss deduction, but in connection with an audit of taxpayer's 1963 income tax return, the Commissioner disallowed the entire deduction. Taxpayer paid the additional taxes and interest assessed and then filed its claim for a refund. The instant suit was commenced upon the Commissioner's failure to act on this claim within six months of its filing.[17]

### B. Action Below

Section 165(a) of the Internal Revenue Code of 1954 allows a taxpayer to deduct any loss sustained during a taxable year that is not compensated for by insurance or otherwise. Treasury Regulation § 1.165–3 specifically allows a taxpayer to claim this deduction in connection with the demolition of a building, provided that the demolition occurs as a result of a plan formed *after* the acquisition of the building. Taxpayer does not challenge the validity of this regulation and admits that it must show that the intent to abandon and demolish the Bering-Cortes Building was formed after April 13, 1962, the date of pur-

chase, if a § 165(a) deduction is to be allowed. *See* United States v. Ivey, 5 Cir. 1961, 294 F.2d 799, 806–808; Bender v. United States, 6 Cir. 1967, 383 F. 2d 656, 660–662. The government agrees that taxpayer's view of the applicable law is correct, and the amount taxpayer will be entitled to deduct if it qualifies under Treas.Reg. § 1.165–3 is similarly undisputed.[18] The only question on this issue is whether taxpayer decided to abandon and demolish the Bering-Cortes Building before or after the date of purchase.

Taxpayer argues that it intended at the time of purchase to use the Bering-Cortes Building in its business. Admitting that it bore the burden of proof on the intent issue, taxpayer put a series of witnesses on the stand, including its president at the time of the transactions, its current president, and its treasurer. All of these witnesses testified that taxpayer intended to use the building and that they were unaware of the conditions that later precluded using the building. In this regard, testimony was given to the effect that it was impossible to conduct a thorough on-site inspection of the Bering-Cortes Building while it was still occupied and that the building's construction plans and specifications were misleading and inaccurate.

Admitting that it invested a substantial sum in purchasing the building "like a pig in a poke," taxpayer nevertheless has consistently maintained that its real purpose was to obtain the building for use in its business. Taxpayer insists, for example, that the engineering report concluding that the building was unsuitable for taxpayer's purposes "came as a great surprise and shock to the management of the company." In sum, taxpayer argues that it bought the building in-

---

17. *See* 28 U.S.C. § 1346(a), and 26 U.S.C. § 7422.

18. The general rule under § 165 of the Code is that the amount of loss is limited to the adjusted basis of the asset less any residual or salvage value it may have. The loss must be taken in the year in which it is "sustained," but the parties

agree that 1963 is the proper year for claiming the deduction, if a deduction is allowable, because that is the year in which taxpayer "abandoned" the building. *See* Hummel v. United States, N.D. Cal.1963, 227 F.Supp. 30; Seminole Rock & Sand Co. v. Commissioner, 1952, 19 T.C. 259.

tending to use it but that information received after the acquisition forced taxpayer to conclude the building was unusable.

The government was unable to produce any direct evidence to controvert taxpayer's version of when the intent to abandon the building was formed. Instead, the government elicited testimony on cross-examination of taxpayer's president that the newspaper's production manager had looked the building over and had rendered an informal opinion regarding it. In addition, however, the government relied on a series of inferences to rebut taxpayer's version of the case:

(1) The very act of purchasing the property for $290,000 without prior inspection suggests that the building was of little real concern to taxpayer and that the land was the real asset being purchased.

(2) The building was purchased on April 13, 1962, and "abandoned" on January 28, 1963, a period of slightly more than nine months, which could support an inference that the building was never intended to be used in taxpayer's business.

(3) The admitted unsuitability of the building for taxpayer's purposes (primarily because of size limitations) supports an inference that taxpayer did not intend to use the building in its business, which is strengthened by taxpayer's subsequent construction of a far larger building.[19]

At the close of the evidence, taxpayer filed a motion for a directed verdict in its favor. Determining that a factual question regarding taxpayer's intent at the time of purchase had been raised, the trial judge denied the motion and submitted the case to the jury. One of the special issues that the judge decided to submit to the jury asked:

"At the time of the purchase by [taxpayer] of the Bering-Cortes Building, did [taxpayer] intend to use that building in its business of publishing a newspaper?"

Taxpayer objected to the submission of the issue in this form and asked for an instruction that would ask the jury whether taxpayer intended, at the time it acquired the Bering-Cortes Building, to abandon or demolish it. In addition, taxpayer requested an instruction that would advise the jury that "intent" means *"dominant intent* or the intent which taxpayer had under the circumstances as they exist at the time or which are foreseen as more probable than not." These requests were refused, and the trial judge's proposed issue was submitted to the jury, which rejected taxpayer's evidence and answered "No." After the return of the jury's verdict, taxpayer filed alternative motions for judgment notwithstanding the verdict or for a new trial. These motions were refused and judgment was entered for the government on this issue.

Taxpayer appeals from the entry of that judgment and assigns the following as error:

1. The failure of the trial judge to grant taxpayer's motions for directed verdict and for judgment notwithstanding the verdict;

2. The failure of the trial judge to grant taxpayer's motion for a new trial;

3. The failure of the trial judge to instruct the jury that taxpayer must have had a dominant intent to abandon and demolish the building if the issue was to be decided against it.

We discuss these contentions in order.

---

19. Taxpayer contended that it desired to use the basement of the Bering-Cortes Building to house its printing presses. The Bering-Cortes Building's dimensions were approximately 75 feet by 125 feet. The facilities for the printing room in taxpayer's new building occupy an area approximately 250 feet by 125 feet.

## C. The Motions for a Directed Verdict and for Judgment Notwithstanding the Verdict

As we made clear in § I, D, *supra,* the standards for determining when a jury may be displaced by granting a motion for a directed verdict or a motion for judgment notwithstanding the verdict are to be found in Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365. The short answer is that such motions should be denied

"if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions. . . ."

*Id.* at 375. Testing the instant motions against the Boeing Co. v. Shipman standards, we find that the trial court properly denied the motions and submitted the case to the jury.

This is not a case in which the jury was left to decide the issues only on a consideration of whether it believed or disbelieved taxpayer's evidence. To the contrary, the government not only cited the possible pre-purchase inspection, it affirmatively relied upon a series of inferences based on the evidence adduced at trial. The first inference cited by the government was a call to the jurors to rely on their common sense to conclude that most businesses do not spend over a quarter of a million dollars without knowing what they are really buying. Were that the only "proof" the government could offer, this might be a difficult case, but there were additional factors the jury could consider. The government's second and third inferences were based, respectively, upon the time period between the date of acquisition of the building and its abandonment and upon the actual unsuitability of the building for taxpayer's purposes. The Regulations specifically provide that such inferences are allowable:

"(c) *Evidence of intention.*

(1) Whether real property has been purchased with the intention of demolishing the buildings thereon or whether the demolition of the buildings occurs as a result of a plan formed subsequent to their acquisition is a question of fact, and the answer depends upon an examination of all the surrounding facts and circumstances. The answer to the question does not depend solely upon the statements of the taxpayer at the time he acquired the property or demolished the buildings, but such statements, if made, are relevant and will be considered. Certain other relevant facts and circumstances that exist in some cases and the inferences that might reasonably be drawn from them are described in subparagraphs (2) and (3) of this paragraph. The question as to the taxpayer's intention is not answered by any inference that is drawn from any one fact or circumstance but can be answered only by a consideration of all relevant facts and circumstances and the reasonable inferences to be drawn therefrom.

(2) An intention at the time of acquisition to demolish may be suggested by:

(i) A short delay between the date of acquisition and the date of demolition;

(ii) Evidence of prohibitive remodeling costs determined at the time of acquisition;

(iii) Existence of municipal regulations at the time of acquisition which would prohibit the continued use of the buildings for profit purposes;

(iv) Unsuitability of the buildings for the taxpayer's trade or business at the time of acquisition; or

(v) Inability at the time of acquisition to realize a reasonable income from the buildings.

(3) The fact that the demolition occurred pursuant to a plan formed sub-

sequent to the acquisition of the property may be suggested by:

(i) Substantial improvement of the buildings immediately after their acquisition;

(ii) Prolonged use of the buildings for business purposes after their acquisition;

(iii) Suitability of the buildings for investment purposes at the time of acquisition;

(iv) Substantial change in economic or business conditions after the date of acquisition;

(v) Loss of useful value occurring after the date of acquisition;

(vi) Substantial damage to the buildings occurring after their acquisition;

(vii) Discovery of latent structural defects in the buildings after their acquisition;

(viii) Decline in the taxpayer's business after the date of acquisition;

(ix) Condemnation of the property by municipal authorities after the date of acquisition; or

(x) Inability after acquisition to obtain building material necessary for the improvement of the property."

Treas.Reg. § 1.165–3.

We agree that the convergence of these allowable factors with taxpayer's direct testimony and the government's cross-examination of taxpayer's witnesses fairly raised a factual question: What was taxpayer's intent at the time it acquired the Bering-Cortes Building? Although the government's evidence was not direct, we hold that it did produce "substantial evidence" in opposition to taxpayer's version and that this evidence was sufficient to prevent displacement of the jury by taxpayer's motions.

### D. The Motion for New Trial

Taxpayer next contends that the jury's verdict was so contrary to the great weight and preponderance of the evidence that the motion for new trial should have been granted. We cannot agree. Great discretion is vested in the district courts to determine whether to grant or deny a motion for new trial, and the general rule on appeal is that the trial court's ruling is not reviewable absent a clear abuse of discretion. *See, e. g.,* United States v. Bucon Construction Co., 5 Cir. 1970, 430 F.2d 420.

Taxpayer's motion for new trial relied upon the alleged failure of the government to produce evidence to controvert taxpayer's version of when it formed the intent to abandon and demolish the building. In the light of what we have already said concerning the government's indirect and circumstantial evidence, § C, *supra,* this point is without legal merit. The verdict was supported by the challenged suggestion that taxpayer did in fact inspect the building in some manner before purchasing it, by the reasonable inferences to be drawn from the period of time between purchase and abandonment,[20] and by the reasonable inferences to be drawn from the fact that taxpayer purchased a building that was in fact unsuitable for its purposes. Under these circumstances, we are unprepared to say that there was any abuse of discretion in the trial judge's allowing the verdict to stand.

### E. The Failure to Instruct the Jury that "Intent" Means "Dominant Intent"

Taxpayer's final argument is that the intent to abandon a building that will defeat a § 165(a) loss deduction must be a "dominant intent." We need not decide in this case whether that view of

---

20. The period here in question was slightly more than nine months. Similar time periods have been held to be probative of intent in other cases. *E. g.,* United States v. Ivey, 5 Cir. 1961, 294 F.2d 799 (eight months); Montgomery Co. v. Commissioner, 6 Cir. 1964, 330 F.2d 950 (two years); Liberty Baking Co. v. Heiner, 3 Cir. 1930, 37 F.2d 703 (over one year).

the law is correct, for even if it is, the jury's answer to the special issue actually submitted to it forecloses the possibility that taxpayer had any intent other than to abandon the Bering-Cortes Building.

Recent cases have indeed held that the intent to abandon and demolish a building must be "dominant" at the time of purchase if a § 165(a) deduction is to be disallowed, *see* Wagner v. United States, N.D.Cal.1972, CCH U.S. Tax Cases ¶ 9,302, at 84,070; Meyer v. United States, D.Mass.1965, 247 F.Supp. 939, affirmed, 1 Cir. 1966, 362 F.2d 264, and an interesting dichotomy has developed in the Supreme Court regarding when intent must be "dominant" under different sections of the Code, *compare* United States v. Generes, 1972, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62, reversing 5 Cir. 1970, 427 F.2d 279, *with* United States v. Donruss Co., 1969, 393 U.S. 297, 89 S.Ct. 501, 21 L.Ed.2d 495. Here, however, under the totality of all the instructions delivered to the jury, the issue was clearly put to the jurors as follows:

"Did this taxpayer *intend to use the building* in its business?"

Taxpayer's argument might be valid—although that question is not now before us—had the question been framed as follows:

"Did this taxpayer *intend to abandon and demolish* the building?"

Under the latter inquiry, taxpayer might have been entitled to an instruction advising the jury to find for taxpayer if it concluded that taxpayer primarily intended to use the building in its business but also had a concurrent (non-dominant) intent to abandon the building *if* certain circumstances should develop. That was not the special issue submitted, however, and the jury found that taxpayer had *no intent to use the building* for business purposes—that is answer enough to taxpayer's argument. We may safely assume that jurors have common sense, and in this case we are satisfied the overall charge to the jury advised them of the proper issue for their determination. Precise use of talismanic words may be desirable in submitting special issues to a jury, but so long as the charge fairly advises persons of common intelligence what the real factual issue is, we will not cast error upon a trial judge for having chosen words different from those the litigants desire.

## IV. CONCLUSION

Although this troika of problems was not easy to manage, it was driven to a correct haven of decision, and the trial court is affirmed in its resolution of each of the triad of issues.

Affirmed.